# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

```
* * * * * * * * * * * * * * * * * * *    *
SALLYANN JOCKSBERGER,                    *
                                         *    No. 10-485V
                     Petitioner,         *    Special Master Christian J. Moran
                                         *
v.                                       *    Filed: February 10, 2015
                                         *
SECRETARY OF HEALTH                      *    Findings of Fact; human
AND HUMAN SERVICES,                      *    papillomavirus ("HPV") vaccine;
                                         *    syncope; seizures.
                     Respondent.         *
* * * * * * * * * * * * * * * * * * *    *
```

Ronald C. Homer, Conway, Homer et al., Boston, MA, for petitioner.
Althea W. Davis, United States Dep't of Justice, Washington, DC, for respondent.

## RULING FINDING FACTS[1]

Ms. Sallyann Jocksberger claims that the human papillomavirus (HPV) vaccine she received on August 17, 2007, caused her to develop neurologic problems. Petition at 1.[2] She seeks compensation through the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10 through 34 (2006).

The details about the way the HPV vaccine caused Ms. Jocksberger's problems, and what those specific problems are, have changed during the litigation. See exhibit 92 (Statement of Dr. Kozachuk); order, issued Jan. 28, 2013. A common denominator in the petitioner's theory is that within minutes of

---

[1] The E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (Dec. 17, 2002), requires that the Court post this ruling on its website. Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4). Any redactions ordered by the special master will appear in the document posted on the website.

[2] The original petitioner was Ms. Jocksberger's father, David Jocksberger. The caption was later amended to designate Ms. Jocksberger as the petitioner as a result of her reaching the age of majority. Order, issued Nov. 3, 2010.

receiving the vaccination, Ms. Jocksberger experienced some sort of seizure.  The Secretary, in contrast, maintains that what happened shortly after the vaccination was an episode of syncope, more commonly known as fainting.

Because the parties differ in their assumptions about what happened in the minutes immediately following the vaccination, a hearing was held to receive testimony from percipient witnesses.  Following this hearing, the parties proposed findings of fact.  This ruling finds facts based upon the preponderance of the evidence standard.

<u>Procedural History</u>

The petition was filed on July 28, 2010.  In support of this petition, Mr. Jocksberger submitted medical records and affidavits (exhibits 1-23) followed by a statement of completion on August 4, 2010.

On October 26, 2010, the Secretary filed her Rule 4 report arguing that petitioner had not demonstrated an entitlement to compensation.  In particular, the Secretary's report argued that Ms. Jocksberger's contemporaneous medical records did not corroborate her claim that she suffered a seizure following her August 17, 2007 HPV vaccination.  Resp't's Rep, filed Oct. 26, 2010, at 17.

After several requests for extension, Ms. Jocksberger filed an expert report from Dr. Walter E. Kozachuk (exhibit 32) on June 22, 2011.  The Secretary filed responsive expert reports from Dr. Michael Kohrman (exhibit A), Dr. Richard Stiehm (exhibit C), and Dr. Edward Cetaruk (exhibit E) on October 25, 2011.  Responsive to the special master's November 16, 2011 order, the Secretary filed a supplemental report from Dr. Kohrman (exhibit G) on December 13, 2011.  Ms. Jocksberger responded with a report from Dr. Naresh Gupta (exhibit 35) on February 29, 2012.

What happened immediately after the vaccination is a fundamental dispute between the parties.  <u>See</u> Resp't's Rep., filed Oct. 26, 2010, at 17.  The parties' experts have drawn different conclusions about Ms. Jocksberger's condition following the August 17, 2007 vaccination.  <u>Compare</u>, on one hand, exhibit 32 (Dr. Kozachuk's Rep.) at 1, <u>and</u> exhibit 73 (Dr. Kozachuk's Supp'l Rep.) at 2, <u>with</u>, on the other hand, exhibit A (Dr. Kohrman's Rep.) at 5, <u>and</u> exhibit C (Dr. Stiehm's Rep.) at 9.

The undersigned identified the syncope/seizure dispute in the first status conference held after the case was reassigned to him. Order, issued Aug. 30, 2012 at 2, ¶7.b. Another issue discussed in that status conference was how the Secretary would respond, if at all, to Ms. Jocksberger's submission of a report from Gabriel Newman, a neuropsychologist. Order, issued Aug. 30, 2012.

For a time, the issue involving the neuropsychological report took prominence and the hearing set for March 2013 was cancelled. Order, issued Jan. 28, 2013. The Secretary requested that a neuropsychologist whom she retained, Deborah Andersen, perform a neuropsychological assessment, including an interview with Ms. Jocksberger. Resp't's Mot., filed Mar. 11, 2013. Ms. Jocksberger opposed this request based, in part, on the report of Dr. Newman. Pet'r's Resp., filed Mar. 29, 2013.

After considering the arguments and evidence, the undersigned recognized that an order granting or denying the Secretary's motion for additional testing would require a delicate balancing of different factors, including Ms. Jocksberger's health. Consequently, the undersigned proposed to defer this ruling. Instead, the better approach would be to focus on how Ms. Jocksberger responded to the vaccination. This emphasis is because Dr. Kozachuk's assumption that Ms. Jocksberger suffered a seizure appears to be essential to his opinion that the HPV vaccine harmed Ms. Jocksberger. This proposal was discussed in a digitally recorded status conference on April 11, 2013.

Ms. Jocksberger opposed the special master's determining what happened after vaccination. Ms. Jocksberger stated that expert testimony would be needed but that neither she nor her mother would testify as percipient witnesses. Pet'r's Status Rep., filed May 13, 2013.

The Secretary, by contrast, supported a procedure in which Ms. Jocksberger's reaction would be determined as a preliminary matter. She, too, saw the seizure/syncope issue as potentially dispositive. Resp't's Status Rep., filed May 22, 2013. Another digitally recorded status conference was held on May 24, 2013. The result of these discussions was an order for the Secretary to file a motion for a ruling on the record.

The Respondent filed this motion on June 24, 2013. Ms. Jocksberger filed her opposition on July 16, 2013.

The undersigned determined that more information from percipient witnesses would be helpful.  See 42 U.S.C. § 300aa—12(d)(3)(B)(iii) (the special master "may require the testimony of any person . . . as may be reasonable and necessary"); Hanlon v. Sec'y of Health & Human Servs., 191 F.3d 1344, 1350 (Fed. Cir. 1999) (finding that special master did not abuse her discretion in calling witness to testify).  Five people appeared to have knowledge about how Ms. Jocksberger behaved immediately after the vaccination.  Two people were Ms. Jocksberger and Ms. Jocksberger's mother, Josephine Jocksberger.  Three people were employees of Brevard Pediatrics, the office where Ms. Jocksberger received the vaccination, Deborah Sapp, Andrea Risberg, and Patty Marchio.  Order, issued Aug. 13, 2013.  A third digitally recorded status conference was held on August 26, 2013.  The ensuing order instructed the Secretary to contact the three witnesses from Brevard Pediatrics.  Order, issued Aug. 28, 2013.

In response to the plan to obtain more information from fact witnesses, Ms. Jocksberger stated that her mother would testify, but she would not.  Ms. Jocksberger also refused to provide releases to authorize communications between the Secretary's attorney and the employees of Brevard Pediatrics.  Pet'r's Opp'n, filed Sep. 4, 2013.  This objection was overruled.  Order, issued Dec. 13, 2013. The Secretary located Ms. Sapp and Ms. Risberg, but could not locate Ms. Marchio.

A hearing was held in Melbourne, Florida on March 20, 2014.  Ms. Sapp, Ms. Risberg, and Ms. Josephine Jocksberger testified as anticipated.  In addition, although Ms. Jocksberger had reported that she could not testify, Pet'r's Status Rep., filed Mar. 10, 2014, ultimately she also did testify.  Unlike the other four witnesses, Ms. Jocksberger testified in a conference room because Dr. Newman recommended a less formal setting.  Exhibit 97.[3]

Following this hearing, Ms. Jocksberger submitted a record from her orthodontist.  Exhibit 98.  The parties submitted a Joint Proposed Findings of Fact ("Proposed Findings") on August 1, 2014.  With this submission, the issue is ready for adjudication.

---

[3] Ms. Jocksberger's oral testimony was the first occasion to hear from her.  She had not submitted an affidavit before her testimony.  Cf.  42 U.S.C. § 300aa−11(c)(1) (noting that a petition shall contain an affidavit).

## Standard for Finding Facts

Petitioners are required to establish their cases by a preponderance of the evidence.  42 U.S.C. § 300aa–13(1)(a).  The preponderance of the evidence standard requires a "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence."  Moberly v. Sec'y of Health & Human Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

The process for finding facts in the Vaccine Program begins with analyzing the medical records, which are required to be filed with the petition.  42 U.S.C. § 300aa–11(c)(2).  Medical records created contemporaneously with the events they describe are presumed to be accurate.  Cucuras v. Sec'y of Health & Human Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Not only are medical records presumed to be accurate, they are also presumed to be complete, in the sense that the medical records present all the problems of the patient.  Completeness is presumed due to a series of propositions.  First, when people are ill, they see a medical professional.  Second, when ill people see a doctor, they report all of their problems to the doctor.  Third, having heard about the symptoms, the doctor records what he or she was told.

Appellate authorities have accepted the reasoning supporting a presumption that medical records created contemporaneously with the events being described are accurate and complete.  A notable example is Cucuras, in which the petitioners asserted that their daughter, Nicole, began having seizures within one day of receiving a vaccination, although medical records created around that time suggested that the seizures began at least one week after the vaccination.  Cucuras, 993 F.3d at 1527.  A judge reviewing the special master's decision stated that "[i]n light of [the parents'] concern for Nicole's treatment . . . it strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms.  It is equally unlikely that pediatric neurologists, who are trained in taking medical histories concerning the onset of neurologically significant symptoms, would consistently but erroneously report the onset of seizures a week after they in fact occurred."  Cucuras v. Sec'y of Health & Human Servs., 26 Cl. Ct. 537, 543 (1992), aff'd, 993 F.2d 1525 (Fed. Cir. 1993).

5

Decisions by judges of the Court of Federal Claims have followed <u>Cucuras</u> in affirming findings by special masters that the lack of contemporaneously created medical records can contradict a testimonial assertion that symptoms appeared on a certain date.  <u>See, e.g.</u>, <u>Doe/70 v. Sec'y of Health & Human Servs.</u>, 95 Fed. Cl. 598, 608 (2010) (stating, "[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), <u>aff'd sub nom. Rickett v. Sec'y of Health & Human Servs.</u>, 468 Fed. Appx. 952 (Fed. Cir. 2011) (non-precedential opinion); <u>Doe/17 v. Sec'y of Health & Human Servs.</u>, 84 Fed. Cl. 691, 711 (2008); <u>Ryman v. Sec'y of Health & Human Servs.</u>, 65 Fed. Cl. 35, 41-42 (2005); <u>Snyder v. Sec'y of Health & Human Servs.</u>, 36 Fed. Cl. 461, 465 (1996) (stating, "[t]he special master apparently reasoned that, if Frank suffered such [developmental] losses immediately following the vaccination, it was more likely than not that this traumatic event, or his parents' mention of it, would have been noted by at least one of the medical record professionals who evaluated Frank during his life to date.  Finding Frank's medical history silent on his loss of developmental milestones, the special master questioned petitioner's memory of the events, not her sincerity."), <u>aff'd</u>, 117 F.3d 545, 547-48 (Fed. Cir. 1997).

The presumption that contemporaneously-created medical records are accurate and complete is rebuttable, however.  For cases alleging a condition found in the Vaccine Injury Table, special masters may find when a first symptom appeared, despite the lack of a notation in a contemporaneous medical record.  42 U.S.C. § 300aa-13(b)(2).  By extension, special masters may engage in similar fact-finding for cases alleging an off-Table injury.  In such cases, special masters are expected to consider whether medical records are accurate and complete.  To overcome the presumption that written records are accurate, testimony is required to be "consistent, clear, cogent, and compelling."  <u>Blutstein v. Sec'y of Health & Human Servs.</u>, No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998).

Special masters will consider various explanations for inconsistencies between contemporaneously created medical records and later given testimony.  The Court of Federal Claims listed four such explanations.  Inconsistencies can be explained by: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist.  <u>La Londe v. Sec'y Health & Human</u>

Servs., 110 Fed. Cl. 184, 203 (Fed. Cl. 2013), aff'd, 746 F.3d 1334 (Fed. Cir. 2014).

In weighing divergent pieces of evidence, special masters usually find contemporaneously-written medical records to be more significant than oral testimony. Cucuras, 993 F.2d at 1528. Testimony offered after the events in question is less reliable than contemporaneous reports when the motivation for accurate explication of symptoms is more immediate. Reusser v. Sec'y of Health & Human Servs., 28 Fed. Cl. 516, 523 (1993). However, compelling oral testimony may be more persuasive than written records. Campbell, 69 Fed. Cl. at 779 ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."); Camery v. Sec'y of Health & Human Servs., 42 Fed. Cl. 381, 391 (1998) (this rule "should not be applied inflexibly, because medical records may be incomplete or inaccurate"); Murphy v. Sec'y of Health & Human Servs., 23 Cl. Ct. 726, 733 (1991) ("[T]he absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance."), aff'd, 968 F.2d 1226 (Fed. Cir. 1992).

The relative strength or weakness of the testimony of a fact witness affects whether such testimony is more probative than medical records. An assessment of a fact witness's credibility may involve consideration of the person's demeanor while testifying. Andreu v. Sec'y of Health & Human Servs., 569 F.3d 1367, 1379 (Fed. Cir. 2009); Bradley v. Sec'y of Health & Human Servs., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

These criteria are considered in the analysis below.

### General Assessment of Witnesses

Deborah Sapp

In 2007, Ms. Sapp was the administrator for Brevard Pediatrics, a job she continued to perform in 2014 when she testified. Ms. Sapp has a certificate in risk management. Tr. 13-14.

Before becoming an administrator, Ms. Sapp was a nurse. Tr. 13. In her training and experience as a nurse, Ms. Sapp learned about syncope and seizures. Tr. 18-21. Although Ms. Sapp has worked as a nurse, she explained that her

present job is not as a nurse.  For example, Ms. Sapp would not administer a vaccine.  Tr. 13.

In February 2009, Ms. Sapp wrote a letter for the petitioner's attorneys, which an attorney reviewed before it was sent.  Ms. Sapp informed the petitioner's attorney that on August 17, 2007, she witnessed Ms. Jocksberger's response to the vaccination, and she told Ms. Jocksberger's mother, on August 17, 2007, that Ms. Jocksberger "had passed out."  Exhibit 4 at 105.

Ms. Sapp's testimony was generally consistent with what she recorded five years earlier.  Ms. Sapp appeared credible.  Her answers appeared spontaneous and unrehearsed.  She was forthcoming and recognized that she should have documented the August 17, 2007 incident on August 17, 2007.  Tr. 24.

## Andrea Risberg

Ms. Risberg was and is a nurse practitioner.  She obtained a master's degree of science in nursing from the Florida International University in 1998.  She is capable of diagnosing children's illnesses and treating them, such as by prescribing medications.  Tr. 37-38.

On August 17, 2007, Ms. Risberg conducted a well-child exam on Ms. Jocksberger.  Exhibit 4 at 25; exhibit 25 at 1; Tr. 44.  She directed Ms. Marchio to give Ms. Jocksberger two vaccinations, a meningococcal vaccine and a human papillomavirus vaccine.  Ms. Risberg did not witness any events after vaccination.  However, she learned about them from Ms. Marchio.  Tr. 44-45.

Ms. Risberg was credible.  She was logical.  She seemed to have a strong grasp on important details.

## Josephine Jocksberger

After graduating from high school, Ms. Josephine Jocksberger became a cardiovascular technician based on education and training at the Midland Career Institute.  Tr. 98.  While working at the Syosset Community Hospital, she was trained as an electroencephalogram ("EEG") technician.  Tr. 99.  As an EEG technician, she placed electrodes on the head of patients.  Tr. 71, 99.  A neurologist instructed the patient during the EEG.  Tr. 102-03.  On occasion, the neurologist directed Ms. Jocksberger to attempt to stimulate a seizure using light.  Tr. 60, 73-74, 103.  She witnessed numerous people having seizures.  Tr. 73-74.  She did not

recall how the neurologist responded to the seizures.  Tr. 75.  Ms. Jocksberger stopped working as an EEG technician in 1989.  Tr. 71.

Ms. Jocksberger brought her daughter to the appointment on August 17, 2007, and stayed with her.  Tr. 76.  Ms. Jocksberger was present for the vaccination and its aftermath.  Tr. 81-87.   Her opinion is that her daughter had a seizure.  Exhibit 95; Tr. 82.  After Ms. Jocksberger and her daughter left the doctor's office, they went home.  Tr. 87.  She did not bring her daughter to the hospital, although a hospital is near the doctor's office.  Tr. 42 (location of hospital).

Ms. Jocksberger was not credible.  Her responses appeared coached and she was hostile to answering questions from the Secretary's attorney.  Much of her testimony was not believable.  For example, her testimony that she did not use terms like "grand mal seizure," when describing her daughter's history, seems particularly implausible, in view of the medical records in which that phrase appears attributed to her.

<u>Sally Jocksberger</u>

She is the petitioner.  In accord with suggestions from Dr. Newman, she was not questioned extensively.  <u>See</u> exhibit 96.  She testified that after receiving the vaccination, she shut down.  Her testimony was credible, just limited in scope.  Tr. 120-31.

**Findings of Fact**

Ms. Jocksberger did not have seizures before August 17, 2007.  On the other hand, Ms. Jocksberger had experienced fainting and syncope before August 17, 2007.  Proposed Findings, at 2-3.[4]

On August 17, 2007, Ms. Risberg saw Ms. Jocksberger.  Tr. 44.  During this appointment, Ms. Jocksberger's mother said "she's a fainter."  Ms. Risberg directed Ms. Marchio to stay with petitioner.  Tr. 44-46.[5]

---

[4] Although these facts are not disputed, Ms. Jocksberger interposed a needless objection.

[5] Given the records showing that Ms. Jocksberger fainted before August 17, 2007, Ms. Josephine Jocksberger's testimony that she would not have described her daughter was a fainter is not credible.  Tr. 76.

Ms. Marchio injected the meningococcal vaccine. Tr. 61-62, 121. Nothing unusual happened. Before Ms. Marchio injected the second vaccine, the one for human papillomavirus, Ms. Josephine Jocksberger called her husband, who is a pharmacist. Ms. Josephine Jocksberger was concerned about the safety of this vaccine. Her husband told her that he did not have any information about this vaccine and Ms. Marchio said that the vaccine was required for school. Consequently, Ms. Josephine Jocksberger consented to the injection of the HPV vaccine. Tr. 80.

Ms. Marchio injected the vaccine. Ms. Jocksberger was seated at the time of vaccination. Tr. 81, 122.

Ms. Jocksberger started to feel weird and very strange. She started to feel herself shutting down. Everything went black, and she lost her hearing. Tr. 121-22, 124-25 (Ms. Jocksberger's testimony); see also Tr. 81 (Ms. Josephine Jocksberger's testimony about what her daughter told her). She slumped forward in her chair, but did not fall from it. Ms. Marchio left the room briefly to get a glass of water. Tr. 62-64.

Ms. Sapp entered the room.[6] Ms. Sapp and Ms. Marchio lowered Ms. Jocksberger to the floor from the chair. Tr. 31. She was pale. Exhibit 4 at 105, Tr. 46 (Ms. Risberg's testimony that Ms. Marchio said Ms. Jocksberger turned white).

Ms. Jocksberger did not have urinary incontinence or lose control of her bowels. Exhibit 4 at 105 (Ms. Sapp's letter); see also Tr. 26 (Ms. Sapp's testimony), 86 (Ms. Josephine Jocksberger's testimony).[7] Ms. Jocksberger did not jerk or thrash her arms around.[8]

---

[6] Ms. Sapp testified some event brought her into the room. Tr. 22-23. It is unlikely that Ms. Sapp was present for the actual vaccination because giving vaccinations was not part of her duties in 2007. Tr. 13, 32. It is likely that Ms. Jocksberger's movement forward either directly prompted Ms. Sapp to enter the room to lend a hand because Ms. Sapp saw Ms. Jocksberger move or indirectly prompted Ms. Sapp to assist because either Ms. Marchio or Ms. Jocksberger's mother yelled "help" after Ms. Jocksberger slumped forward.

[7] Both Ms. Sapp and Ms. Risberg stated that seizures often produce a loss of bladder control. Tr. 20, 50-51.

[8] Whether Ms. Jocksberger thrashed is probably the most disputed issue. Her mother insisted that Ms. Jocksberger thrashed. Exhibit 95; Tr. 62; but see Tr. 85 (Ms. Josephine
(…continued)

Ms. Jocksberger lost consciousness for about one minute.  Exhibit 4 at 105; Tr. 32-34 (Ms. Sapp's testimony), 47 (Ms. Risberg's testimony about Ms. Marchio's account to her), 64 (Ms. Josephine Jocksberger's testimony that everything happened quickly).  When she woke up, Ms. Sapp and Ms. Marchio helped her back to her chair.  Tr. 23-24, 64, 123.  Ms. Jocksberger felt achy and sore all over.  Tr. 27, 123.  She was confused.  Tr. 123.  She also had a headache. Tr. 65, 87.

Despite the foregoing, Ms. Jocksberger walked out of her pediatrician's office on her own.  Tr. 65.  Neither Ms. Jocksberger nor her mother asked to see Ms. Risberg as they were leaving.  See Tr. 49.  Ms. Jocksberger and her mother went home.  They did not go to an emergency room because, according to Ms. Josephine Jocksberger, the medical professionals said that Ms. Jocksberger would be ok.  Tr. 87.

Ms. Jocksberger's next appointment with a doctor was slightly more than two months later on October 29, 2007.  Ms. Jocksberger returned to her

---

Jocksberger could not recall details about movements).  Ms. Josephine Jocksberger's testimony is not credible because of the surrounding circumstantial evidence.

Ms. Marchio did not recognize Ms. Jocksberger's movements as consistent with a seizure.  Ms. Marchio was familiar with seizures from her training as a medical assistant and from having a mother with epilepsy.  Tr. 56; cf. 17 (medical assistants are not nurses).

Similarly, Ms. Sapp, the other Brevard Pediatrics employee with experience in recognizing seizures and who witnessed at least some of Ms. Jocksberger's behavior, did not see evidence of a seizure.  Ms. Sapp would have acted differently for a seizure, such as calling a doctor or 911.  Ms. Sapp told Ms. Josephine Jocksberger that Ms. Jocksberger was not having a seizure.  Tr. 26.  Likewise, if Ms. Risberg had learned one of her patients had a seizure, Ms. Risberg would have checked the patient's blood pressure at a minimum.  Tr. 48, 51.

Petitioner's expert, Dr. Kozachuk, emphasizes Ms. Josephine Jocksberger's training as an EEG technician to establish her ability to recognize a seizure.  Exhibit 73 at 2, 6.  However, there are two problems.  First, Ms. Josephine Jocksberger downplayed her knowledge of seizures.  Tr. 74, 90, 99.  Second, if Ms. Josephine Jocksberger had recognized her daughter's behavior as a seizure, her background would inform her to seek additional medical attention.  The obvious starting place was with the doctors in the office.  If Ms. Josephine Jocksberger were not satisfied, she could have brought her daughter to the nearby emergency room.  Another option was to call for emergency assistance via 911.  Alternatively, Ms. Josephine Jocksberger could have sought care over the weekend or during the following week.  Tr. 107.

But, Ms. Jocksberger's mother did none of those things.  Her actions and inactions on August 17, 2007, are not consistent with the behavior of a person who witnessed her child thrashing around on the floor.  These actions and inactions are more consistent with the behavior of a person who saw a relatively transient event.

pediatrician's office complaining about headaches, among other problems.  The record from this visit does not indicate when the headaches started.  Exhibit 4 at 12-13.  The record also does not mention any behavior resembling seizures (or syncope) on August 17, 2007.  Id.

In subsequent appointments with Ms. Jocksberger, doctors recorded a history of "grand mal seizure" or "generalized tonic clonic seizure."  Exhibit 6 at 4; exhibit 12 at 1.  From reading the record, however, it appeared that Ms. Josephine Jocksberger was the source of these histories.  See exhibit 4 at 51, 100; see also Tr. 70 (Ms. Josephine Jocksberger: "I speak for Sally").  Dr. Kennedy submitted a report to Merck stating that "mother reported generalized seizure movement" following petitioner's August 17, 2007 vaccinations.[9]  Exhibit 4 at 100; Tr. 52-54.  Yet, when presented with these specific records, Ms. Josephine Jocksberger denied knowing from where the terms came.  Tr. 93, 105, 107-10.  In the circumstance in which a doctor did not diagnose Ms. Jocksberger as suffering a seizure near August 17, 2007, an unidentified person's assertion that she had a seizure does not establish, in fact, that Ms. Jocksberger had a seizure.

### Next Steps / Conclusion

Whether Ms. Jocksberger's behavior on August 17, 2007, constituted a seizure, syncope, or syncopal seizure depends ultimately upon expert opinion.  See Knudsen v. Sec'y of Health & Human Servs., 35 F.3d 543, 549 (Fed. Cir. 1994) ("special masters are not 'diagnosing' vaccine-related injuries"); Schneider v. Sec'y of Health & Human Servs., No. 99-160V, 2005 WL 318697, at *2 (Fed. Cl. Spec. Mstr. Feb. 1, 2005) (citing cases about on-Table injuries), mot. for rev. denied, 64 Fed. Cl. 742, 746 (2005).

The parties ARE ORDERED to provide this ruling to the experts they have retained, so that these experts may prepare supplemental reports, opining whether Ms. Jocksberger suffered a seizure.[10]  A status conference will be held on March 4,

---

[9] Mr. Jocksberger, who is a pharmacist (Tr. 80), submitted information to the Vaccine Adverse Event Reporting System ("VAERS") in November 2007.  Mr. Jocksberger stated that his daughter had a "grand mal seizure" following vaccination.  Exhibit 26.

[10] The experts must render an opinion based upon the behavior found in this ruling.  An expert's assumption about the accuracy of a witness's account does not corroborate a witness's account.  Bradley v. Sec'y of Health & Human Servs., 991 F.2d 1570, 1574 (Fed. Cir. 1993).  Similarly, a special master may reject the conclusion reached by a treating physician when that

(…continued)

2015 at 3:00 PM.  The petitioner should be prepared to estimate the date by which Dr. Kozachuk will provide a supplemental report.  Similarly, the Secretary will also be asked to provide a date by which Dr. Kohrman and Dr. Stiehm will provide supplemental reports.

Any questions may be directed to my law clerk, Mary Holmes, at (202) 357-6353.

**IT IS SO ORDERED.**

s/Christian J. Moran
Christian J. Moran
Special Master

---

conclusion is based upon an inaccurate history.  Dobrydnev v. Sec'y of Health & Human Servs., 566 Fed. Appx. 976, 982 (Fed. Cir. 2014), reh'g denied, (Aug, 20, 2014), petition for cert. filed, 2015 WL 254864 (U.S. Jan. 16, 2015)(No. 14-868).