# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

| | | |
|---|---|---|
| SALLYANN ABBOTT, Petitioner, | * | No. 10-485V<br>Special Master Christian J. Moran |
| v. | * | Filed: April 26, 2017 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, Respondent. | * | Attorneys' fees and costs, vague entries, protracted litigation, reasonable hourly rate for neuropsychologist |

Ronald Homer and Christina Ciampolillo, Conway & Homer, P.C., Boston, MA, for Petitioner;
Althea Walker Davis, United States Dep't of Justice, Washington, DC, for Respondent.

## PUBLISHED DECISION AWARDING ATTORNEYS' FEES AND COSTS[1]

Following a lengthy litigation, Ms. Abbott received compensation for her claim that a human papillomavirus (HPV) vaccine caused her to suffer neurologic problems. Ms. Abbott now requests attorneys' fees and costs in the amount of $193,955.15. **Ms. Abbott is awarded $150,499.04**. The reasons for the award and the reasons for the reductions are given below.

---

[1] The E-Government Act, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services), requires that the Court post this decision on its website. Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4). Any redactions ordered by the special master will appear in the document posted on the website.

## Background

Ms. Abbott was born in 1992.[2] In 2007, shortly before her fifteenth birthday, Ms. Abbott received an HPV vaccine as well as a dose of a meningococcal vaccine at the office of her pediatrician, Pediatrics of Brevard (Florida).

The petition alleged that while still in the pediatrician's office, Ms. Abbott suffered a seizure. Pet., filed July 28, 2010, ¶ 3. The source of this allegation was Ms. Abbott's father, David Jocksberger, who stated in an affidavit that his wife, Josephine Jocksberger, said her daughter suffered a seizure. Exhibit 22 (Mr. Jocksberger's affidavit). Histories given to medical personnel much later also mention that within minutes of receiving the HPV vaccination, Ms. Abbott suffered a seizure. Exhibit 6 at 4; exhibit 12 at 1.

However, no records created contemporaneously with the vaccination suggest that Ms. Abbott suffered a seizure. Ms. Abbott's next medical appointment occurred on October 29, 2007. Although she complained about headaches, the medical record does not contain any information about seizures. See exhibit 4 at 12-13.

Following this October 2007 appointment, Ms. Abbott has a relatively complicated medical history, which is generally not relevant to resolving the pending motion. Ms. Abbott saw multiple medical professionals, including general medical doctors, psychologists, a neurologist (Richard Newman), a neuropsychologist (Patrick Gorman), a psychiatrist, another neurologist (Walter E. Kozachuk from Maryland), and another neuropsychologist (Aaron Noonberg).

The timesheets from the attorney show that Mr. Jocksberger first called the law firm who eventually represented him in January 2008. Kevin Conway, the senior member of the law firm now known as Conway & Homer, P.C., conferred with Mr. and Ms. Jocksberger about their daughter's case. Paralegals from the law firm spent more than 50 hours gathering medical records in 2008 and the first three

---

[2] The original petitioner was David Jocksberger, who filed the action on behalf of his daughter, Sallyann Jocksberger, who was not quite 18 years old when the petition was filed. After Sallyann Jocksberger reached the age of majority, she became the petitioner. Finally, during the litigation, Ms. Jocksberger married and changed her last name to Abbott. For ease of reference, this decision treats Ms. Abbott as the petitioner.

months of 2009. Pet'r's Fees App., filed Dec. 12, 2016, Tab A at 1-19. During this time, attorneys spent relatively little time on this case.

As part of gathering medical records, in February 2009, a paralegal communicated with Deborah Sapp of Pediatrics of Brevard. Ms. Sapp wrote a letter to the paralegal in which she stated that after the vaccinations, Ms. Abbott did not have a seizure but, instead, she passed out. Exhibit 4 at 106.

For the remainder of 2009, paralegals continued to gather medical records. This process extended through the middle of 2010. Again, neither Mr. Conway nor Ron Homer (another partner at the law firm) spent very much time on this case. The attorney primarily responsible for representing the petitioner was Christine Ciampolillo. Ms. Ciampolillo began her extensive work on this case in June 2010, when she began drafting the petition.

The 21-page petition was filed on July 28, 2010. It alleged that the HPV vaccination caused Ms. Abbott "neurologic injuries." The case was originally assigned to a different special master.

The Secretary responded to the petition, arguing that Ms. Abbott was not entitled to compensation. The Secretary noted that medical records did not support the assertion that within minutes of the HPV vaccination, Ms. Abbott suffered a seizure. Resp't's Rep., filed Oct. 26, 2010, at 17-19.

On January 18, 2011, the special master directed Ms. Abbott to file an expert report. Ms. Abbott sought and was granted multiple enlargements of time. During this period, Ms. Ciampolillo was frequently communicating with an expert, including sending him literature. See, e.g., Pet'r's Fees App., Tab A at 35 (entry for March 4, 2011). Before the report was filed, Ms. Ciampolillo edited / cite checked the report. See id. at 43 (entry for June 15, 2011). Ms. Abbott filed the report from Dr. Kozachuk on June 22, 2011. Exhibit 32. He maintained that after the HPV vaccination, Ms. Abbott suffered a seizure. Id. at 1.

The Secretary filed responsive expert reports from Dr. Michael Kohrman (exhibit A), Dr. Richard Stiehm (exhibit C), and Dr. Edward Cetaruk (exhibit E) on October 25, 2011. Responsive to the special master's November 16, 2011 order, the Secretary filed a supplemental report from Dr. Kohrman (exhibit G) on December 13, 2011. Ms. Abbott responded with a report from Dr. Naresh Gupta (exhibit 35) on February 29, 2012.

The special master scheduled a hearing for September 19-21, 2012. Pretrial submissions were originally due on August 6, 2012, although subsequent orders modified that deadline. Orders, issued Apr. 3, 2012; July 31, 2012; Aug. 20, 2012; Aug. 27, 2012. As part of this process, Ms. Ciampolillo prepared a brief that Mr. Conway edited.

Among the materials submitted shortly before the anticipated date of the hearing was a report from Gabriel Newman, a neuropsychologist who tested Ms. Abbott at the referral from Dr. Kozachuk. Exhibit 45. Dr. Newman's history asserted that the HPV vaccination "resulted in [an] immediate acute grand mal seizure." Id. at 2. He diagnosed her as suffering from a cognitive disorder, not otherwise specified, "resultant from seizure disorder and other organic changes introduced in 2008." Id. at 18.

Separate from Dr. Newman's report, Ms. Ciampolillo filed 20 medical articles that were not cited in any expert's report. Exhibits 47-66 (filed Aug. 24, 2012).

On August 28, 2012, the case was transferred to the undersigned. The undersigned conducted his first status conference in this case later that day.[3]

The first agenda item was to ascertain Ms. Abbott's position regarding Dr. Newman, whose opinion she introduced close to the anticipated start of the hearing. Ms. Ciampolillo reported that Ms. Abbott preferred to delay the hearing and to call Dr. Newman to testify rather than to proceed with the case as scheduled without him.

The undersigned also inquired as to how Ms. Abbott intended to establish the foundational predicate for Dr. Kozachuk's opinion and Dr. Newman's opinion — that she suffered a seizure after vaccination. Ms. Ciampolillo was ordered to

[3] Although the undersigned was not the special master assigned to this case at its inception, the undersigned has examined the earlier activity closely in finding a reasonable amount of attorneys' fees and costs. See Sabella v. Sec'y of Health & Human Servs., 86 Fed. Cl. 201, 206 n.4 (2009) (rejecting an argument that a successor special master cannot determine reasonable attorneys' fees and costs for time when the case was assigned to another special master).

confer with the petitioner and her mother to see if they would testify as percipient witnesses. Order, issued Aug. 30, 2012.

The petitioner was also ordered to obtain a supplemental report from Dr. Kozachuk. He needed to explain the relevance of the articles that Ms. Ciampolillo had submitted and address the opinions of the Secretary's experts, who had opined that Ms. Abbott was suffering from a conversion disorder. Id.

In the ensuing October 4, 2012 status conference, the Secretary stated that he was retaining an expert to respond to Dr. Newman. This turned out to be Deborah Anderson, a neuropsychologist. The Secretary requested that Ms. Abbott collect the results of the neuropsychological testing (the "raw data") from Dr. Newman and the other neuropsychologists who had tested her.

Also in this status conference, Ms. Ciampolillo reported that she did not anticipate having either Ms. Abbott or her mother testify as percipient witnesses, although Ms. Ciampolillo was "reserving decision" on this topic. Instead, Ms. Ciampolillo believed that the petitioner would rely upon reports of the seizure in the medical records. (These medical records were created much later.)

The timesheets show that Ms. Ciampolillo and the paralegals assisting her spent a great deal of time trying to obtain the raw data. Ms. Ciampolillo again frequently communicated with an expert.[4] In working with an expert, Ms. Ciampolillo was assisted by Sylvia Chin-Caplan, who, at that time, was a partner in the law firm. See Pet'r's Fees App., Tab A at 35-36 (entries from Oct. 2, 2012 through Oct. 10, 2012). On November 13, 2012, Ms. Chin-Caplan and Ms. Ciampolillo flew from Boston, Massachusetts, to Baltimore, Maryland, to meet with Dr. Kozachuk. See Pet'r's Fees App., Tab B at 57 (Dr. Kozachuk invoice, entry for November 13, 2012).

---

[4] As discussed below, a deficiency in the attorneys' timesheets is a lack of specificity. Multiple entries from Ms. Ciampolillo in fall 2012 refer to communications with an expert. Sometimes, Ms. Ciampolillo mentions "Dr. Newman" or "Dr. Gupta." Pet'r's Fees App., Tab A at 79 (entries for Sept. 24, 2012; Sept. 28, 2012). Other entries are for an unidentified expert. Because Ms. Abbott was obligated to produce a supplemental report from Dr. Kozachuk, it seems likely that at least some of the communications with an unidentified expert were with Dr. Kozachuk. However, even if the person with whom Ms. Ciampolillo was communicating can be surmised, Ms. Ciampolillo did not describe the topic of the communications in any detail.

Ms. Abbott filed the supplemental report from Dr. Kozachuk on November 27, 2012. Exhibit 73. Dr. Kozachuk continued to assert that Ms. Abbott suffered "a grand mal seizure within minutes (< 10 minutes) after the vaccinations." Exhibit 73 at 3. Dr. Kozachuk opined that Ms. Abbott suffered posterior reversible encephalopathy syndrome ("PRES"). Id. at 5-6. In the ensuing status conference, Ms. Ciampolillo acknowledged that PRES was a new diagnosis. PRES did not appear in Dr. Kozachuk's first report (exhibit 32) and did not appear in the petitioner's pre-hearing brief, filed on Aug. 13, 2012.

In his report dated November 14, 2012, Dr. Kozachuk cited 25 articles. Some of these 25 articles were among the 20 articles that Ms. Ciampolillo submitted in August 2012. Some of the 25 articles were not. And some of the 20 articles from August 2012 remained unattached to any expert's report. Consequently, Ms. Abbott was directed to obtain another report from Dr. Kozachuk to explain the significance of each article. If an expert could not describe the usefulness of an article, it would be struck from the record. Order, issued Dec. 4, 2012.

The report from Dr. Kozachuk about the relevance of any article was filed on December 20, 2012. Exhibit 92. Because Dr. Kozachuk had changed his theory of how the vaccine could have caused Ms. Abbott's condition, he did not address some articles and these articles were stricken from the record. See order, issued Jan. 3, 2013 (striking exhibits 47, 48, and 49).

After Ms. Abbott produced the raw data generated by the neuropsychologists that tested her, the Secretary requested that Dr. Anderson, the neuropsychologist he had retained, interview and test Ms. Abbott. Resp't's Mot. for Discovery, filed Mar. 11, 2013. The Secretary rarely exercises his right to conduct an "independent medical examination" and the request in Ms. Abbott's case generated a brief in opposition. Pet'r's Resp., filed March 29, 2013. Ms. Ciampolillo primarily drafted the brief with some assistance from Mr. Conway. The petitioner supported her opposition to the Secretary's request with another report from Dr. Newman. Exhibit 94.

Rather than take on the question of whether to require Ms. Abbott to sit for more neuropsychological testing, the undersigned determined that the better course was to find facts about how Ms. Abbott behaved in the minutes after the HPV vaccination. See order issued April 11, 2013. To promote this process, on June 24, 2013, the Secretary filed a motion for a fact ruling on the record. Ms. Ciampolillo, again, was the primary drafter of the petitioner's response to this

motion. Attorneys and paralegals from the law firm prepared an affidavit for Ms. Abbott's mother, Josephine Jocksberger. Exhibit 95.

After reviewing the parties' written submissions, the undersigned determined that a hearing to receive testimony from percipient witnesses would be helpful in determining how Ms. Abbott responded in the minutes after HPV vaccination. The witnesses included Ms. Abbott and her mother. The witnesses also included three employees from Pediatrics of Brevard. Order, issued Aug. 13, 2013.

Ms. Abbott opposed the holding of a fact hearing. She also refused to sign a release that would authorize counsel for the Secretary to communicate with the witnesses about scheduling. Her intransigence caused the Secretary to resort to a motion to compel, which Ms. Abbott resisted. The motion to compel was granted and Ms. Abbott's objection was overruled. Order, issued Dec. 13, 2013.

A hearing was held on March 20, 2014, in Melbourne, Florida. The Secretary had been able to arrange participation from two employees of Pediatrics of Brevard and their testimony was generally credible. The testimony of Ms. Josephine Jocksberger was not credible. The undersigned relied upon the credible and persuasive testimony from the witnesses to make Findings of Fact, issued February 10, 2015.

After the Findings of Fact were issued, Ms. Abbott was instructed to obtain a supplemental expert report. Order, issued March 6, 2015.[5] With the assistance of attorneys and support staff from the law firm, Dr. Kozachuk prepared another expert report. Exhibit 99.

In addition, the undersigned directed the parties to return to the unresolved question of the independent medical exam. On September 14, 2015, the Secretary filed a reply brief and a report from Dr. Anderson. Exhibit N. On October 29, 2015, the Secretary's motion for discovery was granted and the parties were instructed to arrange for testing at a mutually convenient time and location.

Meanwhile, the undersigned suggested that the parties may wish to explore informal resolution of the matter. To promote settlement discussions, Ms. Abbott

---

[5] Around this time, Ms. Ciampolillo went on leave. In her absence, Ms. Chin-Caplan became the attorney primarily handling the case.

filed an affidavit outlining her damages on October 14, 2015. Exhibit 100. These settlement discussions proved fruitful as the parties reported on February 22, 2016, that they had reached a tentative resolution. In due course, the parties submitted their stipulation, which was incorporated into a decision. Ms. Abbott was awarded $80,000. Decision, issued June 20, 2016, 2016 WL 3913462.

On December 12, 2016, Ms. Abbott filed the pending motion for attorneys' fees and costs. Ms. Abbott requested a total of $193,955.15. The components are $157,326.20 in attorneys' fees and $36,228.79 in attorneys' costs. Ms. Abbott personally incurred costs of $400.16.

The Secretary filed a response without presenting any specific objection. The Secretary deferred an evaluation of the reasonable attorneys' fees and costs to the undersigned's discretion. Resp't's Resp., filed Dec. 22, 2016.

## Analysis

The two components of the petitioner's request: (1) attorneys' fees and (2) costs are analyzed separately below.

### 1. Attorneys' Fees

To determine a reasonable amount of attorneys' fees and costs under the Vaccine Act, special masters follow the lodestar approach, which involves a two-step process. Avera v. Sec'y of Health & Human Servs., 515 F.3d 1343, 1347-48 (Fed. Cir. 2008). The first step involves two elements. The judicial officer determines an "initial estimate . . . by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'" Id. at 1347-48 (quoting Blum v. Stenson, 465 U.S. 886, 888 (1984)). Therefore, a special master must determine both reasonable hourly rates for attorneys, and reasonable hours for tasks. Second, the judicial officer may make an upward or downward departure from the initial calculation of the fee award based on specific findings. Id. at 1348. Here, because a special adjustment is not needed, the analysis focuses on the lodestar factors (a reasonable hourly rate and a reasonable number of hours).

#### A. Reasonable Hourly Rates

The group of attorneys working on this case included seven people, all frequent participants in the Vaccine Program and well-known to special masters. The primary attorney, as noted above, was Ms. Ciampolillo. Three partners also contributed to the case. Ms. Chin-Caplan spent the most time, in part because she

filled in when Ms. Ciampolillo was on leave. Mr. Conway and Mr. Homer spent relatively little time on the case. Besides Ms. Ciampolillo, three other associates billed time: Amy Fashano, Joseph Pepper, and Meredith Daniels. Collectively, the seven attorneys have billed at different rates for work in different years.

The billing rates for these attorneys were found in McCulloch v. Sec'y of Health & Human Servs., No. 09-293V, 2015 WL 5634323, at *19 (Fed. Cl. Spec. Mstr. Sept. 1, 2015) (outlining forum rate ranges based on experience), reconsideration denied, No. 09-293V, 2015 WL 6181910 (Fed. Cl. Spec. Mstr. Sept. 21, 2015). The undersigned followed McCulloch regarding these attorneys' rates. Dorego v. Sec'y of Health & Human Servs., No. 14-337V, 2016 WL 1635826, at *3 (Fed. Cl. Spec. Mstr. Apr. 4, 2016). The proposed hourly rates remain reasonable.

In addition to the attorneys, Ms. Abbott's pending motion also seeks an award for activities performed by unnamed paralegals and unnamed law clerks. Although the undersigned recently discussed this law firm's practice of not identifying its support staff (see Floyd v. Sec'y of Health & Human Servs., No. 13-556V, 2017 WL 1344623, at *3-4 (Fed. Cl. Spec. Mstr. Mar. 2, 2017)), repeating these concerns is not necessary here. It is sufficient to note that the proposed hourly rates are consistent with McCulloch.

**B. Reasonable Number of Hours**

The second element in the lodestar formula is a reasonable number of hours. Reasonable hours are not excessive, redundant, or otherwise unnecessary. Saxton v. Sec'y of Health & Human Servs., 3 F.3d 1517, 1521 (Fed. Cir. 1993).

The undersigned conducted a line-by-line analysis of all the entries documented in the timesheets, despite the fact that when making reductions, a line-by-line evaluation of the fee application is not required. McCulloch, 2015 WL 5634323, at *5 (quoting Wasson v. Sec'y of Health & Human Servs., 24 Cl. Ct. 482 (1991)). This review, by itself, took a considerable amount of time as there are approximately 2,000 entries to describe work the attorneys and paralegals performed over the eight years the law firm represented Ms. Abbott. Under these

circumstances, the undersigned has focused on the work performed by each attorney.

**(1) *Mr. Conway***

Mr. Conway worked sporadically on this case, never billing more than seven hours in any particular year. He primarily conferred with Mr. and Ms. Jocksberger and edited briefs that Ms. Ciampolillo wrote. His activities are reasonable and credited in full.

**(2) *Mr. Homer***

Like Mr. Conway, Mr. Homer did relatively little on this case, working no more than six hours in any particular year. His primary activity appears to be reviewing orders that were usually generated from status conferences Ms. Ciampolillo attended or in response to motions Ms. Ciampolillo filed. Mr. Homer's work was, therefore, superfluous in that Ms. Ciampolillo was capable of reviewing these orders herself. Considering that Mr. Homer's hourly rate was approximately one-third higher than Ms. Ciampolillo's hourly rate, Mr. Homer's time is reduced by one-quarter.

**(3) *Ms. Chin-Caplan***

Initially, Ms. Chin-Caplan, too, spent very little time working on this case. However, in 2012, when the case appeared to be heading for a hearing, Ms. Chin-Caplan increased her involvement. Her activities included reading literature and assisting with the preparation of expert reports. Ms. Chin-Caplan also spent significant time on the case in 2015, when Ms. Ciampolillo was on leave. In this time, Ms. Chin-Caplan again assisted with preparing an expert report. See, e.g., Pet'r's Fees App., Tab A at 140 (entry for May 13, 2015 "edit report: 5.7 hours").

However, as discussed in more detail with respect to Ms. Ciampolillo, many entries from Ms. Chin-Caplan are vague. For example, in early May 2015, Ms. Chin-Caplan created several entries that simply say "Review file." Similarly, Ms. Chin-Caplan made other entries for meetings with people, such as Ms. Ciampolillo, that do not identify the purpose or the topic of the meeting. The vagueness of these entries does not provide sufficient information to establish the

reasonableness of the activity. Consequently, Ms. Chin-Caplan's time is reduced by 10 percent.

**(4) *Ms. Ciampolillo***

As the attorney primarily responsible for the case, Ms. Ciampolillo has billed for more than 300 hours. However, she has not established the reasonableness of all these hours.

(a) *Vague Entries*

Although Ms. Chin-Caplan had some vague entries, Ms. Ciampolillo's descriptions of her work are consistently nonspecific. She frequently created entries containing limited information, such as "DRAFT email to expert," or "PHONE CALL with expert." Given that the law firm was working with multiple experts, Ms. Ciampolillo should have identified the person with whom she was communicating. More importantly, Ms. Ciampolillo should have provided some information about the topic or purpose of the communication.

The need to provide some context, explanation, or detail to the communication also applies to entries that Ms. Ciampolillo made when communicating with the client. The Federal Circuit has held that requiring billing entries "adequately identif[y] the purpose of the activities" does "not in most cases invade the attorney-client privilege when applied to client communications." Avgoustis v. Shinseki, 639 F.3d 1340, 1344-45 (Fed. Cir. 2011) (internal quotation marks omitted) (citing McDonald v. Nicholson, 21 Vet. App. 257, 265 (2007)).

(b) *Opposing the Motion for Discovery and the Independent Medical Examination*

In 2012, Dr. Kozachuk, who was acting as an expert witness for Ms. Abbott as well as treating Ms. Abbott occasionally, recommended that Dr. Newman conduct neuropsychological testing. Ms. Abbott filed a report from Dr. Newman (exhibit 45) and believed that Dr. Newman's report was so important that she accepted a delay in the adjudication of her case to allow the Secretary to respond. In 2013, the Secretary proposed that her neuropsychologist administer various neuropsychological tests. Ms. Ciampolillo, on behalf of Ms. Abbott, opposed this request.

The arguments that Ms. Ciampolillo presented fell far short of being persuasive. Under the circumstances in which the petitioner seems to have

obtained the report from a neuropsychologist for the purposes of litigation, it seems only fair to allow the Secretary the same opportunity. Thus, Ms. Abbott's opposition was overruled. Nevertheless, Ms. Abbott's arguments were not entirely frivolous, especially because the Secretary has rarely requested an independent medical exam. Thus, for opposing the motion for an independent medical examination, no adjustment is needed.

(c) *Opposing the Fact Hearing*

In August 2013, the undersigned determined that testimony from percipient witnesses would be useful to determine how Ms. Abbott behaved in her pediatrician's office after the HPV vaccination. The undersigned anticipated that employees from the pediatrician's practice would testify.

Ms. Abbott opposed this and refused to authorize communications to facilitate the employees' testimony. Pet'r's Opp'n, filed Sept. 4, 2013. This opposition was without any basis and served only to make the proceeding more litigious. Ms. Ciampolillo's position was not reasonable in any respect and thus she is not compensated for these activities.[6]

(d) *Overall*

The time spent by Ms. Ciampolillo is reduced by 30 percent. The primary reason is that her billing records are too vague to demonstrate the reasonableness of her work. The deduction of time associated with the testimony of the Brevard Pediatrics witnesses is a secondary reason.

**(5) *Ms. Fashano, Mr. Pepper, and Ms. Daniels***

Collectively, these three associates spent less than 10 hours on the case. Their work largely duplicated work that Ms. Ciampolillo had performed or was capable of performing. Therefore, only 20 percent of their time is credited.

**(6) *Paralegals and Law Clerks***

Unlike some of Ms. Chin-Caplan's and Ms. Ciampolillo's entries, the entries created by paralegals contain sufficient information to determine their

---

[6] Arguably, the petitioner's position was so egregiously obstructionist that an order to show cause for the imposition of sanctions on Ms. Abbott, Mr. Homer, and Ms. Ciampolillo

reasonableness. Examples include: "PHONE CALL: with Baltimore Imaging Center re: status of records requested" (July 14, 2008) and "PHONE CALL: with Osler Medical Center to check on the status of records requested" (July 18, 2008). Consequently, almost all the paralegal hours are credited.

The paralegal tasks that are not creditable are secretarial tasks. Activities that are "purely clerical or secretarial tasks should not be billed at a paralegal rate, regardless of who performs them." Missouri v. Jenkins, 491 U.S. 274, 288 n.10 (1989). Attorneys, thus, may not separately charge for clerical or secretarial work because those charges are overhead for which the hourly rate accounts. See Bennett v. Dep't of Navy, 699 F.2d 1140, 1145 n.5 (Fed. Cir. 1983); McCulloch, 2015 WL 5634323, at *26 (refraining from compensating paralegals from this firm for performing clerical work).

Here, some tasks performed by paralegals were clerical / secretarial in nature. Examples include scheduling status conferences, organizing exhibits, preparing compact discs, revising a short motion after an attorney's review, and filing documents through the CM/ECF system. The law firm charged approximately $3,000 for these tasks. Thus that much is deducted.

The law clerks' work is generally reasonable, although the law clerks, too, could include more detail in their entries. See, e.g. Pet'r's Fees App., Tab A at 100 (entry for March 15, 2013 ("RESEARCH: legal research for CC [Christine Ciampolillo], review case, draft memo to CC")). Adding the topic of the legal research would be relatively easy and provide a better explanation for why the clerk's work is reasonable. Nevertheless, all their work is credited in full.

**C. Summary of Attorneys' Fees**

For attorneys' fees, a reasonable amount of compensation is $124,677.59.

---

could be appropriate because the petitioner's actions forced counsel for the Secretary and the undersigned to take additional steps. See Vaccine Rule 5(c). However, no penalty is being imposed. The hours associated with work in resisting the hearing and in refusing to sign authorizations are being eliminated as this work was unreasonable and unnecessary.

**2. Costs**

For attorneys' costs, Ms. Abbott sought $36,228.79. Many costs are routine, such as those associated with obtaining medical records. These are documented, are reasonable, and are awarded in full. Another set of routine items were Ms. Abbott's own costs of $400.16. Among the attorneys' costs, the three most expensive items are charges for Dr. Gupta, Dr. Newman, and Dr. Kozachuk.

The process for determining a reasonable amount of compensation for retained professionals such as neurologists and life care planners follows the same lodestar method. Experts should present detailed invoices that are created contemporaneously with the hours worked. Caves v. Sec'y of Health & Human Servs., 111 Fed. Cl. 774, 781-83 (2013); Morse v. Sec'y of Health & Human Servs., 89 Fed. Cl. 683 (2009).

**A. Dr. Gupta**

Here, Dr. Gupta has prepared an invoice, requesting compensation for 10 hours of work at a rate of $300 per hour. In the undersigned's experience, the proposed rate of compensation and the proposed number of hours are reasonable.

**B. Dr. Newman**

Dr. Newman earned a Ph.D. in applied developmental psychology. Dr. Newman's curriculum vitae highlights his experience in neuropsychology. See exhibit 71. It appears that Dr. Newman provides his services through The NeuroScience Team, LLC, located in Towson, Maryland.

Dr. Newman's invoice included with the December 12, 2016 motion for attorneys' fees and costs was difficult to read. On March 9, 2017, the undersigned sought clarification regarding the time spent on various tasks, and the justification for the different hourly rates for different tasks. Order, issued Mar. 9, 2017. On March 30, 2017, petitioner filed a detailed invoice that more legibly explained the time spent on different tasks. See Pet'r's Status Rep., filed Mar. 30, 2017. In the undersigned's experience, the tasks and time spent are reasonable.

Also included in the March 30, 2017 status report was a letter on behalf of Dr. Newman explaining that he charged $250 per hour for tasks such as file preparation and email, but instead charged $400 per hour for court appearances, depositions, and in-person meetings that require the cancellation of clinic appointments. See id. The original attorneys' fees and costs motion did not

provide an explanation justifying these rates. While the subsequent status report explained why there are two different rates, neither the petitioner nor Dr. Newman established that other neuropsychologists charge similar hourly rates. For instance, the petitioner did not cite any cases providing a reasonable hourly rate for a neuropsychologist. This information could have assisted the petitioner in meeting her burden. See Raney v. Fed. Bureau of Prisons, 222 F.3d 927, 938 (Fed. Cir. 2000).

Given the sparse evidence to support the hourly rate for a neuropsychologist, the undersigned must look elsewhere for evidence. See Dougherty v. Sec'y of Health & Human Serv., No. 05-700V, 2011 WL 5357816, at *6 (Fed. Cl. Spec. Mstr. Oct. 14, 2011) ("When the parties do not provide reliable evidence, the court can look to other evidence to establish a reasonable hourly rate.") (citing Rupert ex rel. Rupert v. Sec'y of Health & Human Servs., 52 Fed. Cl. 684, 688-89 (Fed. Cl. 2002)).

The undersigned independently found one case discussing a reasonable hourly rate for a neuropsychologist. In Carovski v. Jordon, a 2008 Western District of New York case, a reasonable fee for a neuropsychologist was $250 per hour. See No. 06CV716S, 2008 WL 4501907, at *1 (W.D.N.Y. Sept. 30, 2008). This rate was appropriate whether the neuropsychologist was conducting in-person meetings or participating in a deposition. See id. at *4-5. Adjusting the Carovski $250 per hour rate for inflation leads to hourly rates in this case around $265 per hour. See CPI Inflation Calculator, Bureau of Labor Statistics (Apr. 17, 2017), https://www.bls.gov/data/inflation_calculator.htm.[7] This $265 per hour rate is applied to all of Dr. Newman's 17.5 hours, leading to a total cost of $4,637.50.

**C. Dr. Kozachuk**

Dr. Kozachuk was Ms. Abbott's primary expert. He earned his medical degree from the University of Saskatchewan in 1980. From 1983-87, he had a residency at the Cleveland Clinic Foundation in "Neurology & Medicine." Exhibit 33 (curriculum vitae) at 8. He has written approximately 15 articles published in

[7] The CPI inflation calculator uses the average Consumer Price Index for a given calendar year, derived from changes in prices of all goods and services purchased for consumption by urban households. CPI Inflation Calculator, Bureau of Labor Statistics (Apr. 17, 2017), https://www.bls.gov/data/inflation_calculator.htm.

peer-reviewed journals with the most recent one in 1994. At the time he worked in this case, he was in private practice as a neurologic consultant. Id. at 3-4.

Dr. Kozachuk has prepared an invoice, requesting $23,200, which represents 58 hours of work at a rate of $400 per hour. Dr. Kozachuk's number of hours is reasonable.

Dr. Kozachuk's proposed hourly rate, however, is not. The petitioner has not presented any evidence, other than Dr. Kozachuk's invoice, that suggests $400 per hour is appropriate for Dr. Kozachuk.

In the undersigned's experience, special masters have compensated some neurologists at a rate of $400 per hour. Those neurologists have been board-certified and usually teach neurology at highly respected medical schools. Dr. Kozachuk does not list any board-certifications on his curriculum vitae. His curriculum vitae also does not mention that he has held any professorships at any level. Therefore, solely on the basis of qualifications, Dr. Kozachuk does not match the credentials of the neurologists who routinely are compensated at $400 per hour.

In addition, Dr. Kozachuk did not work independently when compared to neurologists who earn $400 per hour. The attorneys' timesheets show that the attorneys were greatly assisting Dr. Kozachuk. The attorneys provided him articles, reviewed drafts of his report, edited his report, and cite-checked his report. Ms. Ciampolillo appears to have communicated frequently with Dr. Kozachuk, although, as noted above, the topic of discussion is not explained. In effect, the attorneys did some of Dr. Kozachuk's work for him.[8] Therefore, Dr. Kozachuk should not be compensated at the same rate as the experts who do not require as much oversight.

Finally, even with the assistance of the attorneys, Dr. Kozachuk's final product did not match the quality of the reports presented by $400-per-hour

---

[8] An attorney may reasonably assist the expert in preparing the report. In this case, there is no reduction in Ms. Ciampolillo's time because she spent so much time communicating with Dr. Kozachuk. Rather, Ms. Ciampolillo's time has been reduced because the entries she created failed to explain why the extensive consultation was reasonable. It is highly likely that if Ms. Ciampolillo (and Ms. Chin-Caplan to a lesser extent) had described their work in more detail, then no reduction would have been made.

neurologists. In his first report, Dr. Kozachuk accepted Ms. Jocksberger's statement that her daughter had a seizure in the pediatrician's office. Given the surrounding circumstances, Ms. Jocksberger's assertion seems unlikely to be true but this is not necessarily a flaw in Dr. Kozachuk's first report. The first report goes on to assert that the HPV vaccine produced an autoimmune reaction leading to an encephalopathy via molecular mimicry. Exhibit 32 at 4-6.

However, in Dr. Kozachuk's second report, he opined that Ms. Abbott suffered from posterior reversible encephalopathy syndrome. Exhibit 73 at 8. Dr. Kozachuk stated that PRES "is due to a failure of the blood-brain-barrier to maintain the compartmentalization of the intravascular fluid." Id. He further contended that the criticisms by the Secretary's experts of the theory of molecular mimicry are "not relevant." Id. at 13.

In his second report, Dr. Kozachuk introduced a new diagnosis into the case, abandoned the causative theory that he asserted in his first report, and presented a new theory. These changes suggest that Dr. Kozachuk did not present his best work in the first report.

These factors combine to indicate that a reasonable rate for Dr. Kozachuk is $225 per hour. A reasonable amount for Dr. Kozachuk's work is $13,050.00 ($225.00 per hour times 58 hours).

**D. Summary of Costs**

Consequently, for attorneys' costs, **Ms. Abbott is awarded $25,421.29**. She is also awarded her personally incurred costs ($400.16).

## Conclusion

Ms. Abbott is entitled to a reasonable amount of attorneys' fees and costs. For the reasons explained above, a reasonable amount is $150,499.04. This shall be paid as follows:

> **A lump sum payment of $150,098.88, in the form of a check made payable jointly to the petitioner and the petitioner's attorney, Conway & Homer, P.C., for attorneys' fees and other litigation costs available under 42 U.S.C. § 300aa-15(e).**
>
> **A lump sum pay of $400.16, in the form of a check made payable to the petitioner alone.**

In the absence of a motion for review, the clerk of the court is directed to enter judgment herewith.

**IT IS SO ORDERED**.

S/Christian J. Moran
Christian J. Moran
Special Master